FRIEDA WYSOCKI, as Special Adm'r of the Estate of Bohdan Wysocki, Deceased, Plaintiff-Appellant, v. CHARLES J. REED *et al.*, Indiv. and d/b/a Reed, Scoby and Webster, Defendants-Appellees.

First District (6th Division)   No. 1—90—2266

Opinion filed November 15, 1991.—Modified on denial of rehearing December 27, 1991.

James A. Romanyak & Associates, of Chicago (Gregory A. Stayart, of counsel), for appellant.

Louis Hilfman, of Hilfman & Fogel, P.C., of Chicago, for appellees Charles J. Reed and Edward V. Scoby.

Alholm & Monahan, of Chicago (Peter A. Monahan and Linda J. Hay, of counsel), for appellee Charles E. Webster.

JUSTICE EGAN delivered the opinion of the court:

■■ The plaintiff, Frieda Wysocki, brought this complaint against the individual lawyer defendants and their law firm alleging legal malpractice in the handling of the plaintiff's deceased husband's potential products liability claim against two drug manufacturers. In order to recover against the defendants, the plaintiff would have to show that she would have recovered from one or both of the drug manufacturers but for the malpractice of the defendants. Because she was unable to identify which of the two drug manufacturers provided the drug which injured her husband, the trial judge, invoking the traditional rule of causation in fact and rejecting the rule of alternative liability, dismissed the complaint. In seeking the reversal of the judge's order, the plaintiff asks us to adopt the rule of alternative liability which is set forth in the Restatement (Second) of Torts as follows:

"Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not

caused the harm." Restatement (Second) of Torts §433B(3) (1965).

The plaintiff is the widow of Bohdan Wysocki. On or about October 3, 1975, Bohdan Wysocki entered Loyola University Hospital to receive treatment for phlebitis. He was given the prescription drug heparin, a generic coagulent, which was manufactured either by the Upjohn Company (Upjohn) or Wyeth Laboratories (Wyeth). Both Upjohn and Wyeth sold heparin to the hospital.

Bohdan Wysocki allegedly suffered a severe adverse reaction to the heparin, causing the formation of arterial emboli which impaired his blood circulation. As a result, he suffered permanent injuries, including a cardiovascular accident, amputation of his right leg below the knee, paralysis of his right arm, mental disorientation, and loss of speech, memory and self-control. He became totally disabled and died in 1984.

The plaintiff retained the defendant firm to bring suit to recover for the injuries sustained by her husband. The firm filed a medical malpractice suit against Loyola University Hospital and certain of its physicians in 1977. That suit was settled during trial in late 1982. The firm then filed a products liability suit against Upjohn and Wyeth in 1983. However, the suit against Upjohn and Wyeth was dismissed with prejudice in 1984 because of language in the release which had been drafted by the firm in connection with the settlement of the medical malpractice suit against Loyola University Hospital and its physicians. The plaintiff appealed, and the appellate court affirmed the dismissal. *Wysocki v. Upjohn Co.* (1987), 157 Ill. App. 3d 868, 510 N.E.2d 994.

After the affirmance, the plaintiff filed this action against the defendants, asserting that the negligence of the defendants in drafting the release of Loyola University Hospital and its physicians caused her products liability suit to be dismissed with prejudice. The defendants filed a motion to dismiss, alleging that the plaintiff could not identify the manufacturer of the drug that caused the decedent's injuries; therefore, she could not show that "but for" the negligence of the defendants she would have prevailed in the action against the manufacturers.

The plaintiff responded that, under the doctrine of alternative liability, she would not need to identify the manufacturer of the drug given to the decedent. Her complaint alleged that the drug which was administered by the hospital had been manufactured by Wyeth and/or Upjohn. The plaintiff's response admitted that alternative liability had not yet been adopted by the Illinois Supreme Court. However, the

plaintiff contended, had her lawsuit against Wyeth and Upjohn proceeded, the Illinois Supreme Court would have adopted the doctrine of alternative liability and her claim against Upjohn and Wyeth would have succeeded.

The trial judge continued the defendants' motion to dismiss until the Illinois Supreme Court issued its opinion in *Smith v. Eli Lilly & Co.* (1990), 137 Ill. 2d 222, 560 N.E.2d 324. The supreme court's opinion in *Smith* refused to adopt various market share and market risk theories but only briefly discussed the alternative liability theory. It neither accepted nor rejected the theory.

On July 30, 1990, the trial judge granted the defendants' motion and dismissed the complaint with prejudice, stating the following:

"It's real questionable whether or not the attorney should predict what course Illinois law will take *** which is a problem I had with it before. I'll grant the motion."

We have quoted the trial judge in order to clarify the issues. We interpret his remark to mean that, as a matter of law, he would not find legal malpractice for the reason, in addition to the plaintiff's failure to establish causation in fact, that a lawyer should not be held responsible for failure to anticipate a reviewing court would adopt a particular legal theory. That position has not been advanced in this court by the defendants.

The defendants argue that alternative liability should not be accepted as the law of this State and, if it is accepted, it is not applicable to these facts. The defendant, Webster, argues also that he cannot be liable because he was not a partner in the firm and that the plaintiff's claim is barred by the statute of limitations.

Both sides claim support for their positions in the *Smith* case. The plaintiff maintains that, because the supreme court expressly rejected other doctrines of tort liability, but not alternative liability, the court implicitly accepted it. The defendants, on the other hand, construe *Smith* to mean that its refusal to accept the theory advanced by the plaintiff, which was not alternative liability, amounts to a refusal to depart from the traditional requirement of tort law that a plaintiff prove that a defendant did, in fact, cause the injury. (*Schmidt v. Archer Iron Works, Inc.* (1970), 44 Ill. 2d 401, 256 N.E.2d 6.) Our analysis of the question necessarily begins with discussion of the *Smith* case.

In *Smith*, the plaintiff alleged that she had been injured by a drug, abbreviatedly identified as DES, a carcinogen, which her mother had ingested during pregnancy. The plaintiff was unable to identify the manufacturer of the drug given to her mother; she filed

suit against 138 drug companies. A witness testified that there were 81 companies that had marketed DES during the relevant time period. Of those 81 potential manufacturers of the drug that injured the plaintiff, 63 were not named in her complaint. After several procedural motions were decided, 20 companies remained in the lawsuit as defendants.

The trial judge denied the defendants' motion for summary judgment on the strict liability count and adopted "market share" liability, based on the California Supreme Court's decision in *Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132. The appellate court affirmed the trial court's holding on the strict liability count and further held that market share liability should also apply to the plaintiff's negligence count. (*Smith v. Eli Lilly & Co.* (1988), 173 Ill. App. 3d 1, 527 N.E.2d 333.) However, the appellate court rejected the *Sindell* rule and instead adopted the Washington Supreme Court's version of market share liability, articulated in *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 689 P.2d 368. The court also held that the theory of alternative liability was not applicable to DES cases, partly on the ground that all defendants who could have possibly injured the plaintiff were not before the court. *Smith*, 173 Ill. App. 3d at 31.

The supreme court granted leave to appeal and examined several exceptions to the traditional causation requirement, including market share liability, enterprise liability, alternative liability, and *res ipsa loquitur*. However, the court noted that the plaintiff had not cross-appealed from the appellate court's rejection of the alternative liability theory and concluded that it was faced with "only the narrow legal issue of whether to adopt market share liability in negligence and strict liability actions filed by a DES daughter." (137 Ill. 2d at 236.) In deciding that narrow issue the supreme court refused to accept the doctrine of market share liability as adopted in California (*Sindell*, 26 Cal. 3d 588, 607 P.2d 924, 136 Cal. Rptr. 132) and Washington (*Martin*, 102 Wash. 2d 581, 689 P.2d 368). The court also discussed and refused to follow the form of market share liability as adopted by the Wisconsin Supreme Court in *Collins v. Eli Lilly Co.* (1984), 116 Wis. 2d 166, 342 N.W.2d 37 (the "risk contribution" theory) and in the form adopted by the New York Court of Appeals in *Hymowitz v. Eli Lilly & Co.* (1989), 73 N.Y.2d 487, 539 N.E.2d 1069, 541 N.Y.S.2d 941 (national market share theory).

The *Smith* opinion is divided into various subheadings, one of which is entitled, "COURTS WHICH HAVE REJECTED MARKET SHARE LIABILITY." (137 Ill. 2d at 246.) Included in the cases which

allegedly rejected market share liability are *Namm v. Charles E. Frosst & Co.* (1981), 178 N.J. Super. 19, 427 A.2d 1121, and *Senn v. Merrell-Dow Pharmaceuticals, Inc.* (1988), 305 Or. 256, 751 P.2d 215. The court identifies them as cases which refused to adopt "alternative liability." (*Smith,* 137 Ill. 2d at 249.) A reasonable inference arises that the *Smith* court regarded alternative liability as but one more form of the market share liability theory. However, a further reading of that part of the opinion entitled "ANALYSIS OF MARKET SHARE IN ILLINOIS" (137 Ill. 2d at 251) disabuses us of that inference. The court noted that the appellate court in *Smith* had based its conclusion on analogies to *res ispa loquitur* and alternative liability. The court distinguished those theories from market share liability:

"In *res ispa loquitur* and alternative liability situations, all parties who could have been the cause of the plaintiff's injuries are joined as defendants. This helps to preserve the identification element because liability will surely fall on the actual wrongdoer. By contrast, market share liability merely requires the plaintiff to name as defendants either a substantial share of those in the market or, in some theories, only one manufacturer who was in the market. As a result, there is a real possibility that the defendant actually responsible for the injuries is not before the court. Second, in *res ipsa loquitur* and alternative liability, burden-shifting is considered equitable because defendants are typically in a better position than the plaintiff to determine who caused the harm. Market share liability shifts the burden to defendants without regard to whether plaintiff is better able to identify the defendant responsible or without regard to defendants' ability to identify who among them is actually responsible. *** Third, in the earlier exceptions the burden is shifted to parties who bear some culpability for causing plaintiff's injury. In alternative liability, each defendant was at least negligent toward the plaintiff, and in *res ipsa loquitur* at least one defendant caused the injury and the others are intimately connected to the activity and instrumentality that caused the harm. But with market share liability the named defendant need not have been directly connected with the activity or instrumentality that caused the harm. Indeed, it is inevitable that some defendants wholly innocent of wrongdoing towards the particular plaintiff will shoulder part or all of the responsibility for the injury caused." (137 Ill. 2d at 257-58.)

The court also noted that every court that had addressed the question had held, for a number of reasons, that alternative liability does not apply *to DES cases*. 137 Ill. 2d at 257.

Two justices dissented from the rejection of market share liability. After repeating the Restatement rule, the dissent said this:

> "The policy justification for relaxing the causation requirement in alternative liability situations is that it would be unjust to permit 'proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm.' (Restatement (Second) of Torts §433B, comment *f*, at 446.) Although the doctrines of *res ipsa loquitur* and alternative liability may not be applicable to the facts in this case (see 137 Ill. 2d at 257), both doctrines illustrate the fact that traditional tort concepts such as causation in fact must occasionally be modified to meet the needs of our ever-changing society." (137 Ill. 2d at 272 (Clark, J., dissenting).)

We interpret the remarks of the dissenting justices to be expressions of approval of alternative liability. Moreover, in our judgment, it would be inconsistent to accept the more radical departure from the rule of causation in fact by adoption of market share liability, as did the dissenting justices, and to refuse in all cases to recognize the applicability of alternative liability.

Our reading of the majority opinion in *Smith*, however, provides us with no clear expression of the views of the majority on the merits of alternative liability other than the fact that it lacks some of the flaws of market share liability. We therefore conclude that we must decide for ourselves whether the doctrine of alternative liability should be applied *in this case*.

The genesis of the Restatement rule is *Summers v. Tice* (1948), 33 Cal. 2d 80, 199 P.2d 1. In that case the plaintiff was in a hunting party with two companions both of whom negligently fired in the direction of the plaintiff. One pellet struck the plaintiff in his eye and another in his upper lip, but the source of either shot could not be proved. The California Supreme Court spoke as follows:

> "When we consider the relative position of the parties and the results that would flow if plaintiff was required to pin the injury on one of the defendants only, a requirement that the burden of proof on that subject be shifted to defendants becomes manifest. They are both wrongdoers—both negligent toward plaintiff. They brought about a situation where the negli-

gence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can. The injured party has been placed by defendants in the unfair position of pointing to which defendant caused the harm." 33 Cal. 2d at 86, 199 P.2d at 4.

*Summers v. Tice* has been cited and followed in the great majority of jurisdictions that have considered it in cases where all possible tortfeasors have been before the court. We know of only one case that has rejected it. The *Smith* court quoted from *Summers v. Tice* but added, as we have already noted, that every court that had addressed the issue had held that alternative liability did not apply to DES cases. *Smith*, 137 Ill. 2d at 257.

The supreme court of Ohio adopted the rule in *Minnich v. Ashland Oil Co.* (1984), 15 Ohio St. 3d 396, 473 N.E.2d 1199. In that case the plaintiff was injured in an explosion caused by a chemical supplied by one of two defendants; both defendants sold the chemical to the plaintiff's employer. There were dissenting opinions in the case, but they focused on the insufficiency of the evidence to support summary judgment rather than a refusal to accept the doctrine of alternative liability. The Pennsylvania Supreme Court adopted the rule in *Snoparsky v. Baer* (1970), 439 Pa. 140, 266 A.2d 707, and the Michigan Supreme Court in *Abel v. Eli Lilly & Co.* (1984), 418 Mich. 311, 343 N.W.2d 164. The appellate court of North Carolina adopted the rule in *McMillan v. Mahoney* (1990), 99 N.C. App. 448, 393 S.E.2d 298.

The rule has been considered in a number of Federal jurisdictions. In *Menne v. Celotex Corp.* (D. Kan. 1986), 641 F. Supp. 1429, the district judge predicted "with confidence" that the Nebraska Supreme Court would adopt the doctrine of alternative liability. (641 F. Supp. at 1438.) Similarly, in *Poole v. Alpha Therapeutic Corp.* (N.D. Ill. 1988), 696 F. Supp. 351, the district judge held "that the Illinois Supreme Court would follow the vast majority of courts in allowing plaintiffs to proceed on a theory of alternate liability." 696 F. Supp. at 356.

Further discussion of the *Poole* case is appropriate because the opinion illustrates the distinction between alternative liability and other theories, as did the majority opinion in *Smith*. Poole, a hemophiliac, purchased a drug known as factor VIII. The named defendants comprised the complete market of manufacturers, processors, marketers and distributors from which Poole purchased factor VIII over his lifetime. The complaint alleged that the defendants failed to perform screening and heat treating tests; as a result, Poole contracted Acquired Immune Deficiency Syndrome (AIDS) and died. The district judge considered the pleadings under three different theories:

market share, concerted action and alternate liability. He held that the market share theory was not applicable because the plaintiffs had identified all defendants. The concerted action theory was rejected because the plaintiffs could not show that a tacit agreement existed among the defendants to perform a tortious act.

The supreme court of Illinois had not yet decided *Smith*. The district judge recognized that the appellate court in *Smith* had held that alternative liability was not available in DES cases and relied in part on its conclusion that the "alternative liability doctrine contemplates that all defendants who could have possibly injured the plaintiff are before the court," thus insuring that "at least one of the defendants was directly responsible for the plaintiff's harm." (696 F. Supp. at 355.) The judge also emphasized that other courts rejecting the alternative liability theory had done so primarily because not all of the defendants were named in the suits. He concluded that, "[s]ince plaintiffs have identified all of the defendants that could have possibly caused Poole to contract AIDS, this case presents the classic situation contemplated by the alternative liability doctrine. When all defendants are present, courts have adopted the theory. [Citations.]" 696 F. Supp. at 355.

The United States Court of Appeals for the District of Columbia Circuit, citing District of Columbia law, approved the rule in *Bowman v. Redding & Co.* (D.C. Cir. 1971), 449 F.2d 956.

*In re "Agent Orange" Product Liability Litigation* (E.D. N.Y. 1984), 597 F. Supp. 740, *aff'd* (2d Cir. 1987), 818 F.2d 145, involved the settlement of a class action brought by members of the armed forces of the United States, Australia and New Zealand against several major chemical companies for injuries allegedly suffered as a result of the serviceperson's exposure to the herbicide Agent Orange while in Viet Nam. The New York District Court, based on "federal or national consensus substantive law" (597 F. Supp. at 755), accepted the Restatement rule.

The defendants cite *Namm v. Charles E. Frosst & Co.* (1981), 178 N.J. Super. 19, 427 A.2d 1121. We do not agree that that DES case is in point. Although the appellate division of the New Jersey Superior Court identified the cause of action as one brought under alternative liability, it was not, as that term is used here. We restrict the term to cases where all of the possible defendants are before the court. The appellate division, in affirming the dismissal of the complaint, noted that the harm suffered by the plaintiff could have been caused by "one who is not a party to the law suit." 178 N.J. Super. at 33, 427 A.2d at 1128.

There is one case which clearly supports the defendants' position. In *Senn v. Merrell-Dow Pharmaceuticals, Inc.* (1988), 305 Or. 256, 751 P.2d 215, a complaint was filed against two manufacturers of a diphtheria, tetanus and pertussis vaccine. The plaintiff became severely handicapped as a result of use of the vaccine, and she sued the only two manufacturers that could have produced the vaccine she received.

In rejecting the rule, the supreme court of Oregon seemed to have no problem with the rule if it were applicable to cases involving only two tortfeasors:

> "In a two defendant situation, the evidence is in equipoise. As to either defendant it is exactly as likely as not that that defendant caused plaintiff's harm. In theory, one of the defendants can escape liability altogether by presenting some scintilla of exculpatory evidence greater than that the other defendant produces, so that the evidence preponderates against the other defendant." (305 Or. at 270-71, 751 P.2d at 223.)

The court's problem with the rule arose with cases involving more than two tortfeasors. The *Senn* court observed that most courts seemed to feel that a rule of alternative liability modeled on *Summers v. Tice* and section 433B of the Restatement is defensible where the number of defendants is small, but that such a rule becomes unfair at some undefined point as the number of defendants increases. The court questioned why it would be fair to impose joint liability without a preponderance of proof of causation in some cases, but not in others, when the character of the defendant's conduct and the plaintiff's difficulty of proof are the same in either instance. The court also suggested that the quantum of evidence required for a defendant to escape liability might vary with the number of defendants named. If there were three defendants, for example, the court said, there would be only a 33⅓% likelihood that any one defendant was the responsible party. The court questioned what lesser degree of likelihood a defendant would need to show to escape liability. In sum, the *Senn* court seemed to be troubled by the failure of *Summers* to define the precise nature of the defendant's burden of proving that it was not the wrongdoer.

We would not be honest if we refused to recognize that the questions raised in *Senn* are not susceptible of easy answers. Nonetheless, we do not agree with the reasoning of *Senn* that it should reject the particular claim before it involving two tortfeasors because of problems which might arise with more than two tortfeasors.

■ *Senn* also held that, since the policy of the State was involved, any deviation from the rule of causation in fact must come from the legislature. We do not accept that reasoning of the *Senn* court either. The judiciary, no less than the legislature, may be the voice of the public policy of this State. The rule of causation in fact is a rule of the common law, not a statute. As our supreme court spoke in adopting the doctrine of comparative negligence:

"We believe that the proper relationship between the legislature and the court is one of cooperation and assistance in examining and changing the common law to conform with the ever-changing demands of the community. There are, however, times when there exists a mutual state of inaction in which the court awaits action by the legislature and the legislature awaits guidance from the court. Such a stalemate is a manifest injustice to the public. When such a stalemate exists and the legislature has, for whatever reason, failed to act to remedy a gap in the common law that results in injustice, it is the imperative duty of the court to repair that injustice and reform the law to be responsive to the demands of society." *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 23-24, 421 N.E.2d 886.

Acceptance or rejection of the rule depends on the answer to this question: Is it more unjust that an injured party receive nothing because he cannot identify which of two admitted wrongdoers injured him or that both of two admitted wrongdoers be held jointly and severally liable unless one may show by a preponderance of the evidence that the other wrongdoer caused the injury? We believe it is more unjust that the injured party receive nothing from two admitted wrongdoers.

■ Acceptance of alternative liability in this case does not mean that, if the manufacturers of the drugs were the defendants before the court, they would be delivered trussed and gagged for the enrichment of the plaintiff. The plaintiff must still prove that the manufacturers failed to provide adequate warnings and that the injuries suffered by her husband were, in fact, caused by heparin. The manufacturers would be entitled to the defense of the learned intermediary doctrine, if applicable. (*Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 513 N.E.2d 387.) Each manufacturer would be given an opportunity to show that it did not provide heparin to Loyola University Hospital during the relevant period or that it provided a relatively small amount of heparin when compared with that provided by the other defendant. In short, acceptance of the rule would still leave each manufacturer with a fighting chance;

rejection of the rule would leave an innocent injured person with none. We believe that fundamental fairness dictates that we hold that the Restatement rule of alternative liability is applicable to the facts alleged in this complaint.

As a general rule, reviewing courts, particularly intermediate reviewing courts, should be reluctant to expand their holdings beyond those necessary to decide the particular facts before them. Any pronouncement on our part that the rule should be applicable to cases involving more than two tortfeasors would be unnecessary and *obiter dicta.* Consequently, we hold that resolution of the question whether the rule should be applicable to more than two tortfeasors must wait for another day and another case..

■■ The defendants argue that even if alternative liability were adopted in Illinois, it would not apply to this case because, allegedly, the plaintiff cannot prove that all defendants acted tortiously toward the deceased. We disagree. In the plaintiff's underlying products liability action, she alleged that Upjohn and Wyeth acted tortiously by placing a defective drug into the stream of commerce without an adequate warning of its potentially dangerous side effects. The trial court was required to accept this properly pleaded allegation as true. (*Kendall v. Kendall* (1978), 71 Ill. 2d 374, 375 N.E.2d 1280.) Failure to warn of a product's dangerous propensities may serve as the basis for holding the manufacturer or seller strictly liable in tort. (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210.) Therefore, the plaintiff properly alleged that Upjohn and Wyeth both acted tortiously.

The defendants assert that the plaintiff cannot prove that Upjohn and Wyeth acted tortiously toward the decedent; they contend that in order to prove that both defendants acted tortiously toward the decedent, the plaintiff would have to prove that the heparin manufactured by Upjohn and the heparin manufactured by Wyeth were both infused into the decedent's system at the same time. This is an erroneous interpretation of the rule of *Summers v. Tice.* In *Summers,* two hunters shot in the direction of the plaintiff; one pellet lodged in the plaintiff's right eye; and another lodged in his upper lip. The defendants here apparently assume that the pellet that hit the *Summers* plaintiff's eye came from one hunter's gun and the pellet that hit the plaintiff's lip came from the other hunter's gun. The defendants, therefore, conclude by analogy that in the case before us the plaintiff must show that the products of both Upjohn and Wyeth "hit," or were infused into, the decedent. However, in *Summers* it was not clear that one pellet from the gun of each hunter hit the plaintiff. The

California Supreme Court noted that "[i]mplicit in [the trial court's] finding is the assumption that the court was unable to ascertain whether [both] shots were from the gun of one defendant or the other or one shot from each of them." (*Summers*, 33 Cal. 2d at 84, 199 P.2d at 3.) In *Summers*, therefore, the court knew only that both defendants shot in the direction of the plaintiff, not that both defendants hit the plaintiff. Similarly, in the case before us, the pleadings establish that both defendants sold a defective drug to Loyola University Hospital. Thus, both defendants "shot" their product in the direction of the decedent; however, only one product "hit" the decedent. Under the rule of *Summers*, therefore, the plaintiff has proved that both Upjohn and Wyeth were negligent toward the decedent.

■ The defendant Webster argues that the plaintiff's claim is barred by the five-year statute of limitations applicable to legal malpractice claims and that he cannot be held liable for the negligence of his codefendants because he was not a partner in the firm of Reed, Scoby & Webster. Neither argument was raised in the trial court and is, therefore, waived for the purposes of this appeal only.

For these reasons, the judgment of the circuit court is reversed and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed and remanded.

RAKOWSKI, P.J., and LaPORTA, J., concur.